We'll call our final case for today, United States v. Alexander. Good morning, your honors, may it please the court, Mary Kate Healy for Appellant Troy Alexander. I'd like to reserve three minutes for rebuttal. This case implicates the heart of the Fourth Amendment. No place is more sacred than the home. Here, law enforcement officers entered two homes without warrants, the home of Mr. Troy Alexander and the home of his girlfriend, Ms. Venus Nelson. These searches are presumptively unreasonable. I'd like to start with Ms. Nelson's home. Law enforcement officers justified the search there. We got the facts, so let's jump into the questions because we have limited time. Let's talk about exigency. Based on the facts that have been presented to us, there's a return from Philadelphia by Mr. Alexander. The confidential informant has already told the police officers that's where he goes for his drugs. He gets back. He has, he's carrying things in and out of his car and up to the stash house and back. Somebody, a Kia comes, two people, they pick things up, they leave. There's an attempted stop and they get away and they see him on the phone as he's coming, he being Mr. Alexander, as he's coming out of his house. That's the factual background in a nutshell that I understand is in play when the police officers, the team here decides there's an exigency, drugs are going to get destroyed, evidence is going to get destroyed. Now, based on the cases that we've got, you know, going back to 1973 to Rubin itself with the Rubin factors, what is there in that, Ms. Healy, that would lead us to believe that the factual determinations made by the district court were clearly erroneous in saying it was reasonable for the officers to understand that there was an exigency putting the evidence at risk? Your Honor, I think that you review the district court's factual findings for clear error, but its conclusion that there was an exigency is a legal conclusion that you would review de novo. And here, to satisfy the exigency exception, law enforcement must have both probable cause and an exigent circumstance, a now or never situation. Here, that exigent circumstance was purported the fear of destruction of evidence. And based on the facts as you recited them, the question is by whom? They had no reason, to believe that anyone was in Ms. Nelson's home. The CI didn't provide, excuse me, the confidential informant didn't provide any information about Ms. Nelson's home other than, I believe, it's not in the affidavit, but told the police officers that Mr. Alexander had a girlfriend in the neighborhood. So there's really nothing about Ms. Nelson's home that the confidential informant provided. And on top of that, law enforcement- You just gave one of the things. His girlfriend is in this neighborhood, and that's the stash house in the neighborhood. Why is it not reasonable for the police to believe there's somebody in that home, and we have evidence that's at risk? Your Honor, I don't believe that the confidential informant told the police that Ms. Nelson's home was the stash house. I didn't say that. I'm saying what's unreasonable about the police understanding or making an inference that the girlfriend who's in the neighborhood and the stash house that's in the neighborhood are one in the same house, and evidence is at risk. Why is it unreasonable? You just said there's nothing there. That's something. Why can't they make a reasonable inference? We've got evidence at risk. Because they don't observe anyone in the home. It's late on a November evening. They're surveilling the home for several hours, and it's around the time that people might be returning from work. It's dark in November at five o'clock usually, and they don't see a light go on. They don't see anyone come up to the house. No shadows. There's nothing really to point to to say that someone is in that home that might destroy evidence. And that's distinguishable from many of the cases that discuss exigent circumstances, because often this exception arises in the context of police knocking on the door and listening to hear sounds, or they hear scuffling or rustling within the home, and then they think, okay, evidence might be destroyed. That's completely absent from this record. They knock down Ms. Nelson's home. They do not knock and announce, and they immediately secure the premises, which leads me to the second problem with Ms. Nelson's home, the voluntariness of her consent, and whether or not the illegal entry tainted the consent, if this court finds that the consent was voluntary. So can I just... So at least as far as the voluntariness of the consent goes, that's, I think, going to be resolved under a clear error standard, right? So the district court found the consent was voluntary, but it seems that there's... And that's clear error review. But it seems that there's two issues very closely nestled together here. One is whether or not the consent was voluntary, and the second is whether the consent kind of operates as a curative measure to justify the remaining cert. And, I mean, at least the curative measure point might not be a clear error review. You might get de novo review on that, which means you've got a little more room to work. And so I guess my thought is, why isn't... You have to prove that her consent isn't legally sufficient to cure the assumed, if we're at this stage, assumed Fourth Amendment breach. So can you answer that question? Yes, and I think that that goes to the temporal proximity of the illegal entry and then her subsequently obtained consent. So thank you. I just want to clarify that I do believe the district court was clearly erroneous in determining that she voluntarily consented, but assuming that... But why? I mean, she's 48. She's competent. It's not her first rodeo. She's given consent before. Why is it clearly erroneous? Thank you, Judge Porter. I think, actually, that third point is key here. She had given consent before under completely different circumstances. In that earlier consent, police approached her door, knocked, engaged with her, and asked her to consent. Here, she's in her bedroom. It's eight o'clock at night, 830 at night. She's partially dressed. Police enter her home, six to eight of them, guns drawn, immediately begin conducting a protective sweep, call her out from her bedroom. She's at the top of the stairs, and she's handcuffed. That's a completely different... Well, it is completely different, but the district court heard all of that and then credited the police officer's testimony, which was she was startled at first, but she calmed down. She was perfectly rational. There was no indication she was distressed or that she didn't understand what her rights were, and she freely gave us leave to search. Appendix 421, I found Salvamini's testimony to be credible. He spoke directly and with appropriate confidence on both direct and cross. His testimony was consistent, forthcoming, and not overreaching. I did not find Nelson's testimony to be credible. We're faced with a You're just wrong, Chief Judge Connolly. You should have believed her. Your Honor, I'm not challenging Chief Judge Connolly's credibility determinations, and the facts as we've been discussing them are recounted by Agent Salvamini. My argument is that Chief Judge Connolly, the district court, talked about the context, her home, but pretty summarily moved past them to focus on her experience, and that was clearly erroneous. I mean, part of Salvamini's statements are, she was, you know, we startled her, but she calmed down and she was okay. She knew what she was doing when she said, go ahead. And then that would lead me back to Judge Fitt's question, which assuming that the consent was voluntary and that the district court did not err, I don't think that there was sufficient attenuation between the illegal entry here and how drastic that was and her subsequent purported voluntary consent, because it occurs in the space of minutes. As Agent Salvamini talks about, he says it was not a long amount of time, and so this is a pretty significant event. Police officers are in her home armed, and it's all occurring very quickly. No question about it. They bust the door down, they come in, you know, we get it. We understand that. What's your authority for the idea that, Judge Fitt said, let's assume for the sake of discussion that we thought, well, that's wrong. We shouldn't have done that, but they're in. And then she says, if we believe the district court didn't clearly err, and there was consent, what authority do I have to say that consent cannot vitiate or wash away the earlier Fourth Amendment problem? I think that's the Supreme Court's opinion in COP, but also in the brief I cite to Robelis v. Ortega, which is, in my view, a similar situation. It was in a home. Police officers enter. They immediately conduct a search, and they get consent. And there the that consent was not sufficiently attenuated from the breach here. And, you know, when looking at temporal proximity, presence of intervening circumstances, and the purpose and flagrancy of the misconduct, there aren't any intervening circumstances here. They come in, and she consents. This isn't a situation where days have gone by, or she was released from her handcuffs even. So, ultimately, those factors are designed on this attenuation analysis to sever the causal connection between the violation and the consent as curative. And so, I guess my question is, what exactly about the consent, you know, how does this causal connection kind of break down? It has to be between the entry and the consent. Is it the fact that the officers once there saw the drugs in the basement, and therefore her consent can't cure that because they've already seen what she's consenting to them search? But I don't know that that's really in the record. So, what is it that kind of severs the causal connection between the Attenuation is trying to break down and say, despite the fact that there was no legal entry, that that is, we have a separate cause consent for that would justify this. And so, what you're trying to do is you're trying to sever that separate cause, as I understand the argument of consent. And so, the question is, are you saying that she couldn't, that her consent can't sever that cause because the officers were already there, already saw the drugs in the basement? And therefore, her consent is truly just an afterthought at that point in time? Is the fact that the officers represented their likelihood of getting a warrant based on all the evidence they had seen? What exactly is it that severs that cause? Because if there is an independent cause, then we have this doctrine that says, well, if you have an independent cause, the constitutional violation is not going to lead to suppression. I think that, and this might not directly answer your question. So, I think that what they saw in the basement, or them representing that they got a warrant, or they could get a warrant, those might also lead on the voluntariness of whether or not she is voluntarily consenting. But I think the attenuation analysis is that there isn't a significant temporal proximity. There aren't, I suppose those are intervening circumstances that would render her consent not sufficiently attenuated. But I think the attenuation analysis really is that they came in and then she consented. And at that time, in Robella's Ortega, the Seventh Circuit said it's just not sufficient. Well, let's turn to the independent source doctrine for a minute. I know you're on our time now. Thank you, Your Honor. Give us your best pitch on that. You know their argument. Their argument is the warrant was in process, and it was certainly going to be issued. And indeed, it was issued with respect to Alexander's home. And the same affidavit was going to support both. So, would have issued as to the Stash House. So, these things would have been found. And therefore, any constitutional violation that may have occurred is irrelevant. What's the response? I think first, the government does bear the burden of proving that it would have issued by a preponderance. And here, only with respect to Mr. Alexander's home. And the warrant was focused on Mr. Alexander's home. It really only referenced Ms. Nelson's home peripherally. But it was adjusted midstream, right? Would you agree we're in a predictive mode here, right? We have to make a judgment whether that warrant would have issued. And given that the facts that were alleged covered Mr. Alexander's home, but also covered the Stash House, and could have covered the Stash, and the warrant would have been able to cover both based on the same affidavit. I mean, wouldn't it? Maybe that's the better question. Wouldn't the warrant, just as easily, have issued as to the Stash House as to Mr. Alexander's home? TFO Lawrence did represent that he was submitting one affidavit for both. But I think the fact that we're in a predictive mode is distinguishing this case from other inevitable discovery doctrines, where a warrant ultimately did issue. They abandoned that. And I also think that... It's the same affidavit supporting it. And that warrant does indeed issue. But at that point, it's only for the Alexander House. Why is that materially different from other cases you've just noted exist? I think there are two issues there. First, there is a tension between exigency and inevitable discovery. In exigency, the government is arguing that it's reasonable for the officers to believe that evidence is destroyed. And then in inevitable discovery, the government is arguing, but the evidence would have been recovered anyway. So there is a tension that other circuits have. But in these facts, why is there a tension? In the facts that exist here, where is a logical tension between saying, we were getting a warrant, and then an exigency arose? That's the circumstance that's described to us. We were in the process of doing this, and would have done it in the ordinary course. And then the crazy Kia chase happens, and things go sideways on us. And we have to move fast. We have to move fast. I'm failing to see a logical inconsistency there, or any tension at all. There wasn't an exigency, and then all of a sudden, there was. So in that fact pattern, they're abandoning the warrant, because they believe there's an exigency. And I think that the inevitable discovery doctrine for the argument is that it can't apply, where in our view, there is no exigency. There's not an exception to the warrant requirement. Because otherwise, law enforcement could always create, could always get probable cause afterwards. And so then what is the... And so let me just tease in, and see if I understand what you're saying. What you're saying is, look, there's a fundamental tension here between, on the one hand, saying we had to break in without a warrant, because it was so exigent that things were going to be destroyed. At the same time, we would have found the exact same evidence that we never broke in without a warrant, because it still would have been there waiting for us. And so what you're saying is, both can't be true. But at one level, the angle that seems to be the missing variable, and maybe the point I thought you would exploit, is the fact that the reason the government's able to make both arguments that are... I think you make a good point. They are, in many ways, intention. But the reason the government's able to make both points is because the officers are now in the house preventing the destruction. And so the reason that they can say we would have eventually found it is because they're there. And of course, if the officers are there preventing the disruption, you can say, oh, we would have eventually found it had we got a warrant. And so the real question is, I think, can we consider the fact that the officers were already in the house when we evaluate the inevitable discovery doctrine? Because if we can consider that, then it is inevitable discovery. But if we aren't supposed to take that into account, then it seems that the inevitability point begins to falter. So the real question is, can we consider their presence in the house when we... their potentially unlawful presence in the house when we evaluate the inevitable discovery doctrine? Do you see my question? I do see your question. I think the inevitable discovery doctrine applies when an illegal entry has occurred. So I don't think that you can consider them being in the house illegally. Because the inevitable discovery doctrine is a hypothetical doctrine. I think Harold talks about what would happen if the illegal entry had not occurred. And in that situation, then they would not have been in the house. But I mean, the weird thing is, though, the inevitable discovery doctrine is a fix for Fourth Amendment violations. It just so happens here that the Fourth Amendment violation, not only being its own search, seizure, whatever you want to call it, kind of a little bit of both, right, leads to, helps the inevitable discovery doctrine in ways that it doesn't always do that in other senses, such as a forced coercion. You might say, oh, we were still searching the warehouse anyway. We would have found it, that, you know, the evidence here, it's a little more direct. And so do we get to forgive that because the inevitable discovery doctrine operates as an exception to Fourth Amendment violations or work around it? Or do we have to consider that and say, no, we can't consider Fourth Amendment violations as part of the inevitable discovery doctrine? I think the Third Circuit's inevitable discovery doctrine hasn't been applied, I don't believe, in an exigency case. I know Judge Greenberg talked about it in his concurrence in Restitulo. However, I think the constitutional interest at stake here is the sanctity of the home. There is a warrant requirement. Exceptions to the warrant requirement are very carefully delineated to make sure that the home remains safe from government intrusion. And therefore, I think applying an inevitable discovery doctrine in this way would really gut the warrant requirement for homes. And you think it would gut it because, what, it's just free license for the cops to execute a hit and hold anytime they wanted to, and then say, oh, but I was going to get a warrant. Is that the fear you're describing? I think in drug cases, in exigency cases, Kentucky v. King talks about that drugs are easily disposed of when people are aware of police presence. And therefore, it's lower how easy it is for a police officer to get into a home without a warrant. And if you apply an inevitable discovery doctrine to the situation where no warrant actually issued and there wasn't a warrant exception, I think that raises concerns. Of course, when you say no warrant issued, you kind of put the rabbit in the hat there, because a warrant did issue. And the assertion is it would have issued for the stash house, too. We just declined to do it because we were already there. Think on consent. Yeah. I apologize if I misspoke. Yes, the warrant issued for Mr. Alexander's home. It did not issue for Ms. Nelson's home. And I think that the likelihood of it issuing is subject to debate. I think that the warrant's references to Ms. Nelson's home were very few. The confidential informant didn't provide any information about Ms. Nelson's home in particular. And therefore, we're guessing if a detached and neutral magistrate would have approved the warrant for her home. Thank you. All right. Thanks very much. We'll have you back. Rebuttal, Ms. Healy. Carly Hudson for the United States. This case involves four decision points. One, the exigency justifying officer's initial entry into the residence in the stash house. Two, whether upon entry into the stash house, Ms. Nelson gave voluntary valid consent for its search. Three, whether officers obtained a valid warrant to search the residence. And four, whether even assuming officers did not lawfully enter the two buildings, the independent source doctrine and the inevitable discovery doctrine still render the exclusionary rule inapplicable. Why don't you start with the stash house and with the entry and meet Ms. Healy's argument directly that there was not any basis for them to believe that the evidence was at risk in that house, that they didn't, there was no indication that anybody was in the home. There wasn't an identification of the home by the CI as being Ms. Nelson's place. This was just, there was not a reasonable basis to say exigency. Yes, Your Honor. The exigency analysis is one that we necessarily have to view from the perspective of law enforcement officers who are making snap decisions under rapidly evolving circumstances. And circumstances were rapidly evolving in this case. On the evening of the searches, officers watched as Mr. Alexander left Philadelphia, somewhere they knew was a source of supply for him, and then traveled back and forth between his residence and his stash house with heavy bags no less than four times in the span of 40 minutes. Sorry, his house or the stash house? Went, traveled back and forth between his residence and the stash house. Yeah. What was it, because they knew where he was. We understand all the things you just said, but that doesn't seem to speak to Ms. Healy's point, which is there was no reason to believe anybody was in that stash house and going to destroy evidence. They didn't have a reason to bust in there. They knew where Alexander was and they didn't have any cause to think, oh, that you point to, to show it was reasonable for them to believe that evidence was at risk and therefore they could knock the door down and send eight officers in. Your Honor, the officers knew that Ms. Nelson resided at the stash house. We also know from the record that they had been conducting surveillance. How do we know that Ms. Nelson was at the stash house? Because they are making the assertion that you didn't know that. You didn't have any information from the CI to link those places. And maybe even if you did know that, you had no reason to believe she was home. So to answer your first point, officers knew that Ms. Nelson resided at the stash house because a confidential informant had told them that Mr. Alexander's girlfriend lived, quote, in the vicinity of his residence, as well as the fact that on the, at the date of the November 19th controlled purchase, officers watched Mr. Alexander exit the stash house immediately before proceeding to a controlled purchase. How does that, how does that mean they knew she lived at the stash house? I mean, that's a, that's a, an inferential leap you want us to make. That's not proof that, that nobody said, CI never said she lives in the stash house. There's no evidence of that, is there? No, Your Honor. However, it's not required to meet the In fact, we don't have to know objective or subjectively what was in the officer's minds at all. It is an objective reasonableness standard. So how did anyone objectively think that there was anyone in the stash house that was going to destroy any quantity of drugs? Because, Your Honor, officers did know that for the resident, the residence was rented by Mr. Alexander's sister and the stash house was rented by his girlfriend. Officers had been But who was in the house, right? It's entered in circumstances. The whole point is people are flushing drugs down the toilet. Who did they think was, who did they think was in the house that would be flushing drugs down in Ms. Nelson's house? Who did they think would be in the house when they came in and said, if we aren't here now, if we don't wait, we got warrants underway, but if we don't wait, we're going to lose drugs down the toilet. Who did they think was in the house? Ms. Nelson, Your Honor. Why was it reasonable to think that? Was there any indication that there was anyone in the house? Yes, Your Honor. Based on the fact that she rented the house, that officers had been surveilling the stash house since from 6.30 PM to 8.30 PM and there's no indication. So a rental agreement would justify the assumption that because a person rents a that there will be a person in the house who is willing to destroy drugs because a person rents that house. So it's a totality of the circumstances test. Certainly that is a factor that can come into play. There's also the fact that this happened at 8.30 at night, a time when it's reasonable to believe that people would be home. Why did they believe somebody would be home there? When you've a couple of times referred to, she rented the house. Did the officers know that Ms. Nelson rented that house? At the time it was happening, did they know Ms. Nelson was Alexander's girlfriend and that Ms. Nelson rented that house? Officers had that reasonable belief based on the fact that the confidential informant told them that his girlfriend lived in the vicinity. Then here's what will help me, Ms. Hudson, is if we make a distinction between what officers knew and what officers maybe had a reason to believe. So we don't know that they knew that Ms. Nelson rented that house at the time. Is that right? That's correct, your honor. Okay. Then they didn't know that, but maybe inferentially they could say she's in the neighborhood, probably she's the one in the stash house. Is that the argument you're making to us? Yes, your honor. All right. And to return to Judge Phipps' question from a moment ago, is a rental agreement enough? Of course, in and of itself, it's hard to say that any one fact is determinative. However, the Ninth Circuit in Murphy addressed a similar situation. In that case, officers had reason to believe that a storage unit contained a meth lab. They approached the storage unit, knocked, the defendant answered and they arrested him. Thereafter, officers entered the storage unit and conducted a protective sweep because they reasonably believed that somebody might be inside. That reasonable belief was based on the fact that they knew the storage unit was rented by someone else and they did not know for certain where that person was. So had there been an investigation that showed who was renting the house? The investigation was as I've described it so far, your honor. Okay. So at the time it happened, they didn't know who the renter was. They didn't have a rental agreement in the hand say, it's Ms. Nelson. That's correct, your honor. Okay. I mean, you know what? But I mean, we aren't really that far. Your argument really isn't that far away from saying stash houses contain a lot of valuable contraband. It's reasonable for officers to think that there will always be someone in a stash house guarding. Okay. Therefore, it's always a basis for exigent circumstances to go into a stash house because it's a reasonable thing that someone will be guarding that sort of valuable contraband. And that is reasonable, right? People typically don't, you know, contraband is valuable. You tend to want to keep it, you know, under supervision, under watch. And so really that transforms exigent circumstances to really no warrant needed for stash houses. Well, your honor, we don't need to go there because Ruben laid out five different factors for determining exigency. Only one of which is that people are in the vicinity and about to destroy contraband. Another is that the defendant knew that law enforcement officers were hot on his trail. That is certainly something that was at issue in this case, given that the defendant's heavy bag and then successfully fled a traffic stop, hitting multiple police cars in the process. We'll give you that one, that he knew. Say he knew. Did the officers have eyes on Alexander? After he left the residence? No, your honor. They watched him walk out of the residence on the phone. Yes, your honor. So they had eyes on him, right? So they knew where he was. So that doesn't answer the question that Judge Phipps has raised. You know where he is. So he's not going to be the guy destroying the drugs, because you know where he is. Now, how can you step back from the very first Ruben factor, which is there's a risk that these things are going to get destroyed. Where's the risk come from, unless we take the step you're asking us to take, which is inferentially the girlfriend was in the neighborhood and probably in that house and it's 8 30 at night, probably there. And therefore they could go in. I mean, other than following that line of argument, is there any way we get to exigency? Your honor, I think that we have to establish the reasonable belief that contraband was about to be destroyed. Yeah. Somebody's got to be there to destroy. I mean, it's not going to blow itself up. So somebody's got to be there, right? This is not self-immolating drugs, right? Somebody's got to be there. So the question I'm trying to get you to respond to is, is there any other way, because I'm not thinking of one, that we get to exigency unless we make those series of inferences that you're asking us to make. They know that the girlfriend lives somewhere in the neighborhood. They know the stash house is in the neighborhood. They infer the stash house and the girlfriend's house are one in the same. They infer the girlfriend's home. They infer, therefore, that Alexander is in touch with her and therefore the drugs are at risk. Other than that chain of inferences, is there any way to get to exigency? Drugs are going to be destroyed. What other way do we get there? Your Honor, he has laid out the routes to exigency in this situation. Okay. So if we sat back and we thought, that's piling inference on inference on inference, and we're not really comfortable saying that's an exigency, can you rely on the inevitable discovery doctrine? What's your next best thing? Do you go to consent at that point to say, maybe we made a mistake, but she consented? Or do you go to inevitable discovery? Like, what's the order of function here that you would like the court to follow? So your Honor may decide that the exclusionary rule is inappropriate for both the residents in the stash house based on the independent source doctrine for the residents and the inevitable discovery doctrine for the stash house, just assuming arguendo that enough dominoes have fallen for those doctrines to come into play. It's not necessary for your Honors to actually decide that there were no exigent circumstances and that Ms. Nelson's consent was involuntary. You may decide in the first instance that those doctrines are applicable if you so chose. Okay. And so my question to you is, which order would you like us to do those in? What do you think is the order we should approach this in? Exigent circumstances seems to be the thing that's argued most forcibly, but maybe I'm wrong about that. So I'm assuming you think the exigent circumstances piece is your best pitch. But like I said, maybe I'm wrong about that. You tell us what you think the order, your best argument after argument is. Is it exigent source doctrine third or is it some other order? Well, for the sake of flowing logically through time, the officers entered the stash house, then obtained consent. And thereafter, if you find that those things do not come into play, we would hit inevitable discovery. However, I concede that the attenuation analysis for consent for the stash house is a difficult one for us to walk in this case. However, even if your honor was to decide that the officers unlawfully entered the stash house and that entry tainted Ms. Nelson's consent, the inevitable discovery doctrine would then kick in. Inevitable discovery applies where officers are unlawfully in a residence and discover evidence, but would have inevitably discovered it through lawful means and routine police procedures. That's exactly what happened in this case, or what would have happened if your honors were to assume that they entered the stash house unlawfully. Then speak to the tension that Ms. Healy says exists between those doctrines. A sort of a you can't have it both ways pitch that they're making to us. It's an interesting point and not one that philosophically I had spent much time on. However, I think the issue is that we're conflating the independent source and inevitable discovery doctrines. For the inevitable discovery doctrine to apply at all, officers already have to be unlawfully in the place where the evidence is first discovered. So it assumes facts in every instance where that would apply, where we avoid that particular tension. Officers are already there, but they would have wound up there even through lawful means. In this case, a warrant supported by probable cause. But isn't the real issue not just that they were unlawfully there, but that the officers believed that the evidence would have been destroyed? And so it's kind of strange to say the reason that we came in was because we feared that the evidence would have been destroyed. But now that we prevented its destruction, we would have inevitably found it. I mean, isn't that a little weird? Because really what you're saying is assuming it's unlawful. Our unlawful entry is what prevented its destruction. And I don't know that the inevitable discovery doctrine, it focuses on unlawful entry, but I don't know that it can negate the fact that officers previously believed that the evidence was about to be destroyed had they not unlawfully entered. And so it's kind of weird. It almost begins to assume too many counterfactuals. It begins to say, okay, they're here unlawfully. The reason they were here unlawfully is because they were advocating an evidence destruction theory. But now that they're here unlawfully, they don't have to worry about that evidence destruction rationale anymore. Forget it. It was all wrong. And now we can just say they would have found it anyway since they're here. It seems that it paves a really, really nice way for being wrong about exigent circumstances and still saying, well, now that we're here, now that nothing's destroyed, we would have eventually found it. And to the extent that reasonableness is kind of in the hallmark of Fourth Amendment analysis, there's something about that that I'm going to need a lot of reassurance from you convinces me that that's reasonable. So, Your Honor, the seminal case on inevitable discovery is Nix. And in that case, the court didn't find it necessary to wrestle with this level of philosophical tension between it's almost a Schrodinger's cat situation. If I enter the home, then I assure that the evidence will be there. But then I trigger an inevitable discovery doctrine whereby I assume that if I had not entered the home, the evidence would still be there. The law does not require such mental gymnastics. The inevitable discovery doctrine's purpose is to balance the deterrent effect of the exclusionary rule with the jury and the public's interest in hearing probative evidence. And the Supreme Court in Murray found that when evidence would have, putting this philosophical issue aside, would have been discovered through lawful means, as the court found in Nix and was discussed in Restitulo and others, would have been lawfully discovered otherwise. The deterrent effect of the exclusionary rule is so minimal that it is far outweighed by the jury and the public's interest in hearing probative evidence. So your argument is, well, let me start with one more question. Is the independent source doctrine a species of inevitable discovery? Is it a subset of inevitable discovery? Yes, Your Honor. Okay. So your argument is that inevitable discovery, uh, it doesn't take on a different hue because the violation that we're worried about was an exigent circumstance, uh, kind of mistake. It, it operates no matter what the mistake with respect to the Fourth Amendment is. That's correct, Your Honor. If I understood you correctly? Yes, Your Honor. All right. Um, Judge Borer? Judge Phipps? Okay. Uh, thanks very much, Ms. Hudson. Thank you. Ms. Healy? Thank you. Uh, first, I, I want to address briefly the characterization of Ms. Nelson's home as a stash house. The affidavit did not describe it as such. The affidavit referenced it very briefly. And there's really, I think in the district court, it was referred to as a stash house for ease of reference. And, and the district court said, I'm not making a finding that this is actually a stash house. This is, this is a home. It may be a home, but it's a home where Mr. Alexander was keeping some of his drugs, right? So I'm not sure how you're going to get a lot of traction out of saying it's a stash house. It's not a stash house, but it's your, it's your bubble time. Go ahead. Thank you, Your Honor. My point is perhaps that law enforcement did not know it was a stash house until they reached the home and then discovered evidence unconstitutionally. They saw him going back and forth with a heavy, with heavy bags, which they believed, and assert reasonably believed, contained drugs. So they watched stuff happen that led them to believe drugs are going into that house, didn't they? On the facts we've got? They observed that behavior, moving a trash bag from a car into the home, and then I believe a home to the other. And I think that the case on which the government relies, Stern, to argue that that is evidence of shuttling is distinguishable in that Stern involved several defendants. The confidential informant in Stern actually provided information about each of the locations. That is not at issue here. And one of the locations in Stern that was involved in shuttling was a gym, which most individuals go to maybe twice a day at most. And so it's a little bit different to go between two homes a block apart than the facts at issue in Stern. But to return back to the inevitable discovery doctrine, I do think it's different than the independent source doctrine in that the independent source doctrine is a lawful, I'm stumbling, the independent source doctrine isn't hypothetical, whereas the inevitable discovery doctrine is. And I think that you're saying one, it's not a subset, independent, isn't an independent source a way of saying, just a way of saying, we would have gotten to here, we would have gotten to the same spot anyway, regardless of tainted ways to get here. Is that not just a species of inevitable discovery? No, I don't think so. I think that they are different. And I think that in Herald, the Third Circuit distinguishes them and pulls them apart. And I don't think that there's a case that applies the inevitable discovery doctrine to exigent circumstances. I get what you're saying, that there's not perfect overlap between the two doctrines, whether they're family members, whether subspecies, interesting question. But I guess my thought is this, doesn't convincing us, let's say you convince us that there's no exigent circumstances, right? Let's say we totally believe, let's say we think that there's absolutely no risk that any of that evidence would have been destroyed and the officers were completely and totally inappropriately in Ms. Nelson's house. If we believe that vision of the world, that predictive model, right? Doesn't that mean that we would also have to believe that since none of the drugs were going to be destroyed, that they would have been inevitably discovered? I mean, I'm flipping the tension on you. In your opening argument, you attempted to flip it on the government, which I thought was very, very well done. But like most tensions, it cuts both ways. And so, if we really, really believe that there was no risk that evidence is going to be destroyed, doesn't that really mean that the officers would have found it through awful means, assuming that they could have got the warrant to do so, which might not be that big of a stretch since what they know about Alexander is underway and they know that he's got a warrant called the neighborhood? I'm sorry, I missed just the last part of your question there. Couldn't they just get, I mean, couldn't they still get the warrant on Nelson? So, if we believe that there's going to be no destruction, none, no real risk of destruction, then it kind of seems like it would have been inevitably discovered. I agree that the tension can work against me. And I think that then the argument has to be that it's an exception to the warrant requirement in the first among equals, the home, which enjoys pride of place in constitutional jurisprudence. And therefore, police officers should get warrants to enter homes unless an exception applies that is very carefully delineated to protect the public's interest in being free from government intrusion. Okay, thanks very much, Ms. Healy. Thank you, your honors. We appreciate both sides to go ahead and take the matter under advisement and recess court.